IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 07-cv-00944-MSK-KMT

RONALD B. GRASSI and
DEBRA GRASSI,

       Plaintiffs,

v.

CORRECTIONS CORPORATION OF AMERICA,

       Defendant.
_____

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**
_____

**THIS MATTER** comes before the Court pursuant to Plaintiff Debra Grassi's Objections[1] **(# 48)** to the March 6, 2008 Minute Order **(# 47)** of United States Magistrate Judge Kathleen M. Tafoya granting in part and denying in part Ms. Grassi's Motion for Leave to Appear at the Deposition of Plaintiff Ronald Grassi **(# 43)**; Defendant Corrections Corporation of America's ("CCA") Motion for Summary Judgment **(# 53)**, the Plaintiffs' response **(# 67)**, and CCA's reply **(# 77)**; and CCA's Renewed Motion to Seal Exhibit P **(# 81)** to its summary judgment motion.[2]

---

[1] Because these Objections relate to the conduct of a deposition that has already occurred, Ms. Grassi's Objections are overruled as moot.

[2] In light of the standards previously discussed in the Court's October 3, 2008 Opinion and Order Denying Motions to Seal **(# 80)**, CCA's renewed motion to seal Exhibit P to its summary judgment response is granted. The exhibit sought to be sealed is a CDOC policy governing the transportation of inmates. CDOC itself has designated this policy as confidential and of limited dissemination, because it contains material that, if publicly disclosed, would

1

# FACTS

For purposes of the Motion for Summary Judgment, the Court views the facts in the light most favorable to the Plaintiffs.[3] Mr. Grassi is an inmate of the Colorado Department of Corrections ("CDOC"), incarcerated at the Crowley County Correctional Facility ("CCCF"), a prison operated by CCA.

On the afternoon of May 8, 2005, Mr. Grassi began experiencing sudden abdominal pain and nausea. That evening, he obtained permission to visit CCCF's infirmary. He explained his symptoms and the staff nurse, indicating his supposition that he was suffering from appendicitis or food poisoning. The nurse conducted a preliminary examination, taking his vital signs, asking him a series of questions about the location and extent of his pain, and conducting a physical examination of his abdomen. After conferring by telephone with Dr. Jere Sutton, the facility's on-call doctor, the nurse administered Mylanta anti-gas pills and Pepto-Bismol. As directed by Dr. Sutton, Mr. Grassi was then sent to the infirmary's holding cell to remain under further observation by the infirmary's staff.

---

reveal sensitive security procedures and staffing levels to be used during inmate transportation outside of prison facilities. The Court finds that CDOC's security interests in keeping this material confidential outweighs the public interest in access to court records, particularly because the particular details of the transportation procedure are of fairly minimal relevance to the issues resolved herein. Accordingly, the motion to seal is granted.

[3]The bulk of the facts recited herein are derived from Mr. Grassi's affidavit **(# 58)**, and to the extent not inconsistent with Mr. Grassi's affidavit, from medical records and other materials submitted by CCA. Ms. Grassi also supplied an affidavit **(# 59)** regarding many of the same events, but it is evident that she does not possess firsthand knowledge of the events that occurred at CCCF on May 8-9, 2005, and in those respects, her affidavit consists largely of hearsay that would not be admissible at trial.

He experienced some relief when lying down, but continued to have abdominal pain when sitting up and requested from the nurse that he be permitted to see a doctor. The nurse advised him that the doctor would not be available "for a couple of days," but that Mr. Grassi could remain in the infirmary's holding cell until then. Mr. Grassi instead requested that he be permitted to return to his own cell, and upon being asked by the nurse if her thought he was well enough to do so, replied that despite his ongoing pain, he would rather return to his cell. Approximately 45 minutes later, nearing midnight, Mr. Grassi was allowed to return to his cell.

At 3:30 a.m., Mr. Grassi suffered more intense pain and nausea and summoned guards, requesting that he be permitted to return to the infirmary. The guards opened his cell door to permit him to go to the infirmary, but he was unable to walk. Guards brought a stretcher for Mr. Grassi and brought him to the infirmary. He asked the medical staff to summon an ambulance and was told that the staff was "taking care of it." In fact, prison staff summoned a prison van at 3:45 a.m. in case Mr. Grassi required transportation. At 4:15 a.m., after additional observation and treatment and consultations between the infirmary staff and Dr. Sutton, Dr. Sutton directed that Mr. Grassi be transported to the hospital. Mr. Grassi was prepared for transportation and was dispatched from the prison by van at 5:17 a.m. for the 42-mile trip to the hospital in Pueblo, Colorado.

Mr. Grassi arrived at the hospital at 6:04 a.m., received x-rays, and was diagnosed as having acute appendicitis. He immediately underwent surgery to remove his appendix, which was discovered to be perforated. Following the surgery, he experienced a variety of

complications,[4] including an abdominal abscess, bowel obstruction, and a drug-resistant staph infection. He required several additional surgeries and extended healing time to recover.

The Plaintiffs commenced this action pursuant to 42 U.S.C. § 1983, alleging six causes of action, some of which seem to overlap: (i) violation of Mr. Grassi's Eighth Amendment rights under the U.S. Constitution, in that CCA acted with deliberate indifference to his medical needs in failing to timely and adequately diagnose him, staff the infirmary, and transport him for further medical treatment; (ii) violation of Mr. Grassi's Eight Amendment rights, insofar as CCA acted with deliberate indifference to his medical needs by knowingly hiring inexperienced and unqualified medical staff; (iii) a claim for negligence under Colorado law, in that CCA failed to exercise reasonable care in staffing its medical department with personnel with adequate experience to diagnose abdominal complaints and in failing to provide for prompt transport of Mr. Grassi to a hospital for treatment; (iv) a claim for negligence asserted only against former Defendant Dr. Jere Sutton; (v) a "claim" that CCA and Dr. Sutton should be held jointly liable for any injuries to Mr. Grassi because they were engaged in a "joint venture"; (vi) a claim by Ms. Grassi against CCA under Colorado law for loss of consortium.

---

[4]The Plaintiffs do not affirmatively assert that the complications were the result of actions or inaction of CCA, as opposed to having no known cause, or being caused by carelessness by the surgeon or hospital. The Plaintiffs point to testimony by Dr. Sutton, who responded to the question "If a patient has appendicitis and they're not timely treated by laparoscope or by surgery, they're more likely to have infections and ongoing problems, correct?" with the response "That's possible." *Docket* # 67-3 at 111-12. However, the doctor also responded to the question "Is it possible that if Mr. Grassi had received treatment earlier than by 6:00 that he would not have gone on to develop peritonitis, sepsis, bowel obstructions and those types of infections?" with the response that "I have no way of knowing that." *Id.* at 113. The Court notes that the Plaintiffs have not proffered any expert testimony as to the cause(s) of Mr. Grassi's complications.

CCA moves for summary judgment **(# 53)** on all of the claims against it, arguing: (i) as to all of the Eighth Amendment claims, Mr. Grassi cannot show that any of CCA's employees manifested "deliberate indifference" to his medical needs, nor that such indifference resulted from a custom or policy of CCA; (ii) as to the negligence claim, Mr. Grassi cannot hold a corporation liable for the medical malpractice of a physician under Colorado's corporate practice of medicine doctrine, and further, that because Mr. Grassi has not endorsed any expert witnesses, Mr. Grassi cannot show that Dr. Sutton's treatment fell below established standards of medical care nor show that any negligent medical treatment was the cause of his complications; (iii) that with regard to any claim for "joint liability," Mr. Grassi cannot prove a tortious act, nor show that the relationship between Dr. Sutton and CCA constitutes a "joint venture"; and (iv) that Ms. Grassi's loss of consortium claim fails because she cannot show that CCA was negligent with regard to Mr. Grassi.

## ANALYSIS

### A. Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual

dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

Where the moving party does not have the burden of production at trial, the movant must demonstrate the absence of sufficient evidence in the record to establish one or more elements of each challenged claim or defense. The burden then shifts to the respondent to come forward with sufficient competent evidence to demonstrate a genuine dispute of material fact with regard to each challenged element. If the respondent fails to produce sufficient competent evidence that, if accepted by the factfinder, would establish its claim or defense, the claim or defense must be dismissed as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### B. Eighth Amendment claims

To establish an 8th Amendment claim premised upon deliberate indifference to his medical needs, an inmate plaintiff must show: (i) a sufficiently serious deprivation of medical care; and (ii) that the defendant responsible for the deprivation acted with a sufficiently culpable state of mind. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). With regard to the element of intent, "deliberate indifference" requires a state of mind "more blameworthy than negligent," but this can be "something less than acts or omissions for the very purposes of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. It is a state of mind akin to

recklessness, and occurs when the defendant "knows of and disregards an excessive risk to [the] inmate['s] health or safety."*Id.* at 837. It is not enough to show that a defendant provided ineffective or even negligent medical treatment. *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 198 n. 5 (1989); *Duffield v. Jackson*, 545 F.3d 1234, 1238 (10th Cir. 2008). An Eighth Amendment violation arises only where a defendant subjectively knows of an excessive risk to the plaintiff's safety but nevertheless disregards that risk. *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).

In this case, the facts, even when taken in the light most favorable to the Plaintiffs, fail to show deliberate indifference on the part of CCCF's staff. For purposes of this analysis, it is helpful to consider Ms. Grassi's two separate visits to the infirmary independently.

As to the first visit, the record shows that, at most, the CCCF medical staff may have misdiagnosed his condition upon his arrival and deferred to his request to return to his cell. But it is undisputed that the staff conferred with a doctor and attempted to treat the condition that was diagnosed by giving Mr. Grassi Mylanta pills and Pepto-Bismol. Moreover, rather than demonstrating indifference or disregard of his condition, the record shows that the infirmary staff placed him in an observation cell and checked up on his condition on several occasions in the ensuing hours. Mr. Grassi concedes in his brief that "it is a presumption that close monitoring of [Mr.] Grassi's condition" – that is, continued observation by the infirmary staff – "would have more readily led to a diagnoses and more timely transportation to a hospital for surgical treatment." *Docket* # 67 at 26. Far from amounting to deliberate indifference, at best, the Plaintiffs have only shown that Mr. Grassi's first visit to the infirmary resulted in ineffective or

negligent treatment. This is insufficient to establish an Eighth Amendment claim. *DeShaney*, 489 U.S. at 198 n. 5.

The Plaintiffs contend that "it would be unjust to dismiss" Mr. Grassi's constitutional claims because prison officials "return[ed] him to his cell and fail[ed] to monitor and document his condition." This argument fails to acknowledge the undisputed fact that Mr. Grassi expressly requested to leave the infirmary's observation cell and return to his own cell. He represented to infirmary staff that he had experienced some relief of symptoms from lying down and that he felt well enough to return to his cell. Thus, the undisputed facts show that the infirmary staff had selected a course of treatment that would have "more readily led to a diagnosis," but that Mr. Grassi himself chose to frustrate that treatment by electing to forego additional monitoring and instead, to return to his cell. Under these circumstances, the Court finds that no reasonable factfinder could conclude that the initial treatment of Mr. Grassi at the infirmary cannot be found to constitute deliberate indifference to his medical needs in violation of the Eighth Amendment.

The analysis differs somewhat with regard to Mr. Grassi's second trip to the infirmary. Mr. Grassi sought medical help again at approximately 3:30 a.m. the following morning. It is undisputed that he was quickly attended to by CCCF medical staff and transported to the infirmary. The Plaintiffs do not dispute CCA's assertion that a prison van was summoned almost immediately thereafter, at 3:45 a.m., in case Mr. Grassi required transportation. It is also apparently undisputed that medical staff monitored and treated Mr. Grassi throughout this period, including twice attempting electrocardiogram tests, and that the facility's staff contacted the on-call doctor by telephone for further instructions. At 4:15 a.m., Dr. Sutton gave authorization for Mr. Grassi to be transported to the hospital, and it is undisputed that the van

8

containing Mr. Grassi left CCCF at 5:17 a.m. It completed the 40-mile trip to the hospital in a reasonable amount of time, arriving there at 6:04 a.m.

With regard to this portion of the incident, the Court does not understand Mr. Grassi to be asserting that he received inadequate medical attention from CCCF staff during this phase of the incident; were he to do so, the Court would reach the conclusion that he has failed to show that such attention could be considered to be "deliberate indifference." Rather, the Court understands his challenge to be limited to the delay in securing his transportation to the hospital.[5]

The record is undisputed that, as a precaution, a prison van was summoned at 3:45 a.m., within 15 minutes of Mr. Grassi's request for additional medical treatment. While the van was en route, prison medical staff conducted various examinations and tests on Mr. Grassi, and continued to consult with Dr. Sutton by telephone, and at 4:15 a.m., Dr. Sutton directed that Mr. Grassi's be transported to the hospital.[6] The van, which is apparently located off-site and staffed by on-call corrections officers, arrived at the prison at 4:30 a.m. The record establishes that, typically, arranging transportation of a prisoner by van requires a period of 30-45 minutes

---

[5]Mr. Grassi's failure to follow the Court's formatting requirements for summary judgment responses, *see* MSK Practice Standards, Civil, § V.I.3.2, makes it particularly difficult to ascertain his position with regard to the claims and elements upon which CCA seeks summary judgment. Mr. Grassi's response does not address each of his claims independently, nor does he identify the elements of each distinct claim. His factual recitations occur in a single narrative, rather than separately identifying the particular evidence that supports each individual element of each claim. The Court has endeavored to give Mr. Grassi's response brief a fair reading, but to the extent Mr. Grassi's position on a certain issue is unclear, the Court will not abdicate its role as a neutral by combing the brief and the record in an attempt to make Mr. Grassi's case for him. *See e.g. Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir.1998).

[6]The record appears to reflect that Dr. Sutton did not specifically direct the means (*e.g.* van, ambulance) by which the transportation, and simply assumed that the prison would effectuate the transport by the most expeditious means possible.

of preparation from the time the van arrives at the facility, during which the corrections officers operating the van clock in and gather equipment, the inmate is dressed for transportation and fitted with appropriate restraints, and medical records are copied. The van containing Mr. Grassi left the facility at 5:17 a.m. and arrived at the hospital, 42 miles away, at 6:04 a.m.

An Eighth Amendment violation can occur where medical care for an inmate is unnecessarily delayed. *Sealock*, 218 F.3d at 1210. Courts commonly recite the rule that "delay in medical care only constitute an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm." *Id.*; *see also Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005); *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001). But this observation is not the entirety of an Eighth Amendment claim founded on delay, and an inmate alleging an Eighth Amendment claim based on delayed medical treatment does not prove the claim simply by showing that a delay in treatment caused additional pain or additional injuries. The Eighth Amendment's ban on cruel and unusual treatment is violated only when the deprivation (or delay) of medical treatment constitutes "the <u>unnecessary</u> and <u>wanton</u> infliction of pain." *Estelle*, 429 U.S. at 104 (emphasis added). A delay in treatment that is unintentional or unavoidable, even though it may result in the inmate suffering additional harm, is not actionable. *See e.g. Estelle*, 429 U.S. at 104-05 ("indifference is manifested . . . by prison guards in <u>intentionally</u> denying or delaying access to medical care") (emphasis added); *Hood v. Prisoner Health Services, Inc.,* 180 Fed.Appx. 21, 25 (10th Cir. 2006) (unpublished) ("<u>inadvertent</u> or negligent failure to provide medical care, however serious the consequences," does not establish a constitutional violation) (emphasis added), *citing Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980). Thus, to prove a claim of deliberate indifference predicated on the delay in providing

medical care, an inmate must show: (i) that he suffered from a serious medical need; (ii) that medical care to address that need was unnecessarily delayed; (iii) that the delay manifested the defendant's subjective disregard for the inmate's needs; and (iv) that the delay caused the inmate to suffer substantial harm, whether in the form of significant pain or permanent physical injury. *See e.g. Estelle*, 429 U.S. at 104-05.

Here, Mr. Grassi has not come forward with facts that would show that the delay in effecting his transportation to the hospital was intentional or avoidable. For all practical purposes, the analysis of whether there was undue delay must begin at 4:15 a.m., when Dr. Sutton directed that Mr. Grassi be sent to the hospital. (To the extent Mr. Grassi complains of an Eighth Amendment violation during the period between 3:30 a.m. and 4:15 a.m., the record establishes that he received medical attention during this period and that absent a direction that he be transported to the hospital by the doctor, that could not have occurred.) The prison van arrived 15 minutes after Dr. Sutton's directive. If anything, the 15 minute delay between the transport order and the van's arrival is <u>shorter</u> than it might otherwise be. The record reflects that, once summoned from their homes, the on-call corrections officers can take half an hour or more to get the van to the prison. Thus, the infirmary staff's foresight in calling for the van before Dr. Sutton's directive actually shortened the time that Mr. Grassi had to wait, as compared to a situation in which the van was not summoned until Dr. Sutton directed transportation.

Next, there was a delay of approximately 45 minutes between the van's arrival at the prison and its departure at 5:17 a.m. with Mr. Grassi inside. This delay is consistent with evidence supplied by CCA (to which the Plaintiffs have offered no contrary evidence) that

11

preparing an inmate for transportation typically requires anywhere from 30-45 minutes once the van arrives. *Docket # 53-7 at p. 40-42*. While one may hope that, in a medical emergency, all efforts are made to expedite the process, in the absence of specific evidence suggesting that CCCF staff unnecessarily delayed Mr. Grassi's preparation for transport[7] – much less evidence suggesting that the delay was recklessly indifferent to Mr. Grassi's situation – the fact that his preparation required a typical amount of time does not suffice to show deliberate indifference.

Finally, the record reflects that it took approximately 45 minutes for the van to travel the 42 miles to the nearest hospital.[8] Beyond complaining that the van drivers "hit bumps without slowing," the Plaintiffs do not comment on the duration of this portion of the journey. If anything, Mr. Grassi's affidavit appears to complain that the van driver <u>did not</u> slow down during the journey. In the absence of evidence that would suggest that the van driver unnecessarily prolonged the trip, no Eighth Amendment violation can be found here.

---

[7]Mr. Grassi's affidavit briefly alludes to the possibility that his transportation was delayed pending a determination whether another inmate should be transferred to the hospital at the same time. The entirety of the affidavit on this point reads: ". . . I was finally told they were going to transport me to the hospital by van. . . I could hear them saying the van was there, but hold it because there's another patient complaining of migraines that might also need to be transported and they need to check him out." *Docket # 58 at 5*.
  Besides the evidentiary concerns arising from Mr. Grassi's overhearing an unidentified individual allegedly directing that they "hold it," the mere fact that the van had arrived does not indicate that Mr. Grassi was otherwise ready to be transported at that moment. As discussed above, the undisputed evidence indicates that as much as 30-45 minutes of preparation time is necessary once the van arrives at the prison. Even accepting Mr. Grassi's contention that the van was at the facility while medical staff contemplated transporting another inmate at the same time does not establish that Mr. Grassi was otherwise ready for departure and that his departure was needlessly delayed.

[8]Mr. Grassi's affidavit states that "we passed a hospital . . . further down the highway," but no reference to this assertion is made by Mr. Grassi in his brief. CCA's own policies, upon which the Plaintiffs rely, specifically identify the hospital 42 miles away as the nearest facility for emergency treatment.

Accordingly, the Court finds nothing in the Plaintiffs evidence that would establish any unnecessary delay in effecting Mr. Grassi's transportation to the hospital.

Moreover, even assuming the Plaintiffs could show both an unnecessary delay in dispatching Mr. Grassi to the hospital and the requisite subjective intent of deliberate indifference, the Plaintiffs' Eighth Amendment claims relating to this delay would nevertheless fail because they have not shown that Mr. Grassi suffered any substantial harm as a result of the delay. As discussed above, an inmate alleging an Eighth Amendment violation resulting from delayed treatment must show that the delay caused him to suffer "substantial harm." *Sealock*, 218 F.3d at 1210. "Substantial harm" occurs when an inmate is forced to suffer substantial pain or experiences some permanent loss or disfigurement due to the delay. *See Hunt v. Hiphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999). Although the Court assumes that Mr. Grassi experienced severe abdominal pain from 3:30 a.m. through the moment his surgery began, and assumes that the various surgeries required to treat his complications left him with permanent disfigurements of one kind or another, the fact remains that the Plaintiffs have not come forward with evidence to show that the delay in transporting him to the hospital caused this harm. For example, they offer no evidence that, had the prison van left CCCF as early as 4:15 a.m. or had an ambulance been used for transport, Mr. Grassi would have been admitted for surgery an hour earlier, and thus spared an hour's worth of abdominal pain.[9] It is equally possible that, due to scheduling or availability at the hospital, Mr. Grassi's surgery would have occurred at the same time even if he had arrived earlier. Similarly, the Plaintiffs only speculate that the complications Mr. Grassi

---

[9]The Court need not reach the question of whether, in these circumstances, Mr. Grassi suffering one additional hour's worth of pain is sufficient to constitute "substantial harm" for purposes of an Eighth Amendment claim.

suffered after the surgery were the result of delayed treatment at CCCF. They offer no testimony that the complications occurred because of CCCF's delay in transporting him, as opposed to the complications arising inevitably out of the need for surgery or due to the negligence of the surgeon, among other possibilities.[10] Under these circumstances, the Plaintiffs have not shown that any delay in treatment necessarily caused Mr. Grassi to suffer substantial harm.

The Plaintiffs do offer a convoluted and confusing argument that appears to allege that, wholly aside from the particular treatment received by Mr. Grassi in this situation, CCA failed to enact (or perhaps comply with) policies that would have resulted in Mr. Grassi receiving more prompt transportation or more competent medical attention. The Court finds that this argument is not well-formed and well-presented in the Plaintiffs' brief, but even assuming the Court were to attempt to evaluate it on its merits, it is unsupported by evidence that would show that compliance with the policies they identify would have yielded a different results i n this case. For example, the Plaintiffs appear to believe that, had CCCF staff summoned an ambulance instead of the prison van, Mr. Grassi's transportation could have been effectuated more rapidly. However, beyond bald speculation in their brief, the Plaintiffs point to no evidence that would establish that, indeed, an ambulance would have been more expeditious in this situation.

Accordingly, CCA is entitled to summary judgment on Mr. Grassi's Eighth Amendment claims.

---

[10]At best, they offer the deposition testimony of Dr. Sutton, who was not endorsed as an expert by either side, and who testified that he "ha[d] no way of knowing" whether Mr. Grassi would have developed complications had he received treatment earlier.

## C. Negligence claim[11]

CCA moves for summary judgment on Mr. Grassi's claim of negligence under Colorado law by invoking the "corporate practice of medicine doctrine." Under Colorado law, "it is impossible for a fictional entity, a corporation, to perform medical actions or be licensed to practice medicine. *Villalpando v. Denver Health and Hosp. Auth.*, 181 P.3d 357, 364 (Colo. App. 2007). Because a corporation cannot interfere with a physician's independent medical judgment, Colorado law generally shields corporations from vicarious liability for the negligent acts of its physician employees.[12] *Id.* CCA argues that, to the extent Dr. Sutton committed any medical malpractice in misdiagnosing Mr. Grassi, the Plaintiffs thus lack a remedy in negligence against CCA.

The Plaintiffs' response to this contention is not entirely clear. They argue that "a correctional facility can be held liable in negligence for the actions of its employees who are not licensed professionals." *Citing Nieto v. State of Colorado*, 952 P.2d 834, 840-41 (Colo. App.

---

[11]The parties did not address the issue of whether the Court should continue to exercise supplemental jurisdiction over the remaining state law claims if the Court granted summary judgment on Mr. Grassi's constitutional claims. 28 U.S.C. § 1367(c)(3). However, the Court exercises its discretion to retain supplemental jurisdiction over these claims, rather than dismissing them in contemplation of state court litigation. The case has been fully litigated before this court, and directing the Plaintiffs back to state court to begin anew in state court would not serve the goals of prompt and efficient judicial administration.

[12]For these same reasons, CCA is entitled to summary judgment on the Plaintiff's fifth "claim," which alleges that CCA is jointly liable for negligence by Dr. Sutton. The Plaintiffs extensively argue common-law principles of joint and several liability, but fail to recognize that the corporate practice of law doctrine shields CCA from liability for Dr. Sutton's negligence, regardless of the theory upon which that vicarious liability is premised.

15

1997). In other words, the Court understands the Plaintiffs to assert that CCA is vicariously liable for any negligence committed by its nurses.[13]

*Nieto* recognizes that "[a]n employer can therefore be held liable for a nurse's negligence, so long as the nurse was one of its employees." *Id.* However, to establish CCA's vicarious negligence in these circumstances, the Plaintiffs must identify the particular act or omission of a non-physician employee that constitutes negligence. *Villalpando*, 181 P.3d at 365. Moreover, *Nieto* also contemplates an exception to this rule: an employer cannot be held liable for the negligence of a nurse who is acting at the direction of and under the supervision of a licensed medical professional. *Id.* at 841.

Here, the Plaintiffs allege that, when Mr. Grassi presented at the infirmary, "Dr. Sutton took a verbal report [from the infirmary nurse] and ordered treatment and observation." *Docket # 67 at 2*. Dr. Sutton indicated that the nurses should "check [Mr. Grassi] regularly," and indeed, Mr. Grassi's own affidavit acknowledges that "several times the 2 nurses checked in on me and they would stand at the door and observe me." The only instance in which the Plaintiffs appear to allege that a nurse engaged in conduct that was not specifically directed by Dr. Sutton was when a nurse permitted Mr. Grassi to return to his cell.[14] Dr. Sutton testified that he was not

---

[13]This appears to deviate from the negligence theory articulated in the Complaint, which seems to allege that CCA is responsible for its own negligence in making various policy choices before the events at issue with Mr. Grassi. The Court will consider only the iteration of the claim as articulated by the Plaintiffs in response to the summary judgment motion, and will assume their intent to abandon the claim in the Complaint to the extent it differs. In any event, for the same reasons discussed with regard to the Eighth Amendment claim, the Plaintiffs offer only supposition that enactment of different policies or more rigid compliance with existing policies would have yielded more expeditious or effective treatment for Mr. Grassi.

[14]The nature of the medical treatment received by Mr. Grassi when he was readmitted to the infirmary after 3:30 a.m. the following morning is not clear from the record. Thus, it is

16

consulted on whether Mr. Grassi should be permitted to return to his cell, but that the infirmary nurse had the discretion to allow that to occur "[i]f the person is getting along and doing well." Because this is the only instance in which a nurse made a treatment decision other than at the direction of Dr. Sutton, this is the only instance that would fall outside of the corporate practice of medicine doctrine and thus, the only action that could support a claim of negligence against CCA .

The Plaintiffs have not established facts that would show that the nurse's decision to release Mr. Grassi to return to his cell was negligent. To establish a claim of negligence, a plaintiff must establish, among other things, that the defendant deviated from an accepted standard of care. *Land-Wells v. Rain Way Sprinkler and Landscape Co.*, 187 P.3d 1152, 1153 (Colo. App. 2008). Establishing the appropriate standard of care in a claim involving medical malpractice requires proof of what a reasonably careful physician in the same medical discipline as the defendant would have done in the circumstances. *Svendsen v. Robinson*, 94 P.3d 1204, 1208 (Colo. App. 2004), *overruled on other grounds*, *Trattler v. Citron*, 182 P.3d 674 (Colo. App. 2008). Unless the matter involves issues within the common knowledge and experience of ordinary persons, a plaintiff must establish the controlling standard of care by expert opinion testimony. *Id.; citing Melville v. Southward*, 791 P.2d 383, 387 (Colo. 1990).

The parties have devoted considerable effort to addressing whether expert testimony is required to establish a standard of care here, but that discussion misses a more fundamental

---

unclear what, if any, treatment the infirmary nurses provided, much less whether they did so at the specific direction of Dr. Sutton. In any event, the Court discerns nothing in the Plaintiffs' response that would suggest that any of the actual medical treatment he received during the second infirmary visit was negligent.

point: nothing in the Plaintiffs' submissions offers <u>any</u> evidence, expert or otherwise, of the appropriate standard of care for nurses who consider whether to release an individual from observation in circumstances such as these. Similarly, there is no evidence that the infirmary nurse deviated from such standard.

The <u>only</u> evidence cited by the Plaintiffs in this respect is testimony from Dr. Sutton. He testified that the nurses had the discretion to release a patient in these circumstances if "the person is getting along and doing well." Nothing in the record defines what Dr. Sutton meant by "getting along and doing well" means, making it impossible on this record to determine whether the nurse's decision to release Mr. Grassi fell within or outside of that standard.[15] Dr. Sutton testified that he would have "wanted [Mr. Grassi] to be held until his abdominal pain subsided," but the record does not indicate whether such testimony was purporting to opine as to the standard of care applicable to the infirmary nurse or just expressing a personal opinion as to how Dr. Sutton would have hypothetically handled the situation. Because the Plaintiffs have not come forward with evidence that shows the standard of care applicable to the infirmary nurse in this situation, nor evidence that shows that the decision to release Mr. Grassi was a deviation from that standard, they cannot show that the infirmary nurse acted negligently. Without a showing of negligence by the nurse, there is no predicate for imposing vicarious liability against CCA. As a result, CCA is entitled to summary judgment on Mr. Grassi's negligence claim.

---

[15] According to CCCF's medical records, Mr. Grassi stated at the time that he was "doing better," was having "decreased abdominal pain" and was "up and walking around."

18

### D. Loss of consortium claim

Finally, CCA argues that it is entitled to summary judgment on Ms. Grassi's loss of consortium claim because the Plaintiffs are unable to show any negligence involving Mr. Grassi. The Plaintiffs' response brief does not address this issue.

Ms. Grassi's loss of consortium claim is derivative of Mr. Grassi's right to recover for legal wrongs done to him and is therefore subject to the same defenses as would be assertable against Mr. Grassi. *Schwindt v. Hershey Foods Corp.*, 81 P.3d 1144, 1148 (Colo. App. 2003). In other words, if Mr. Grassi is unable to prove a claim entitling him to relief, Ms. Grassi's loss of consortium claim will automatically fail. Because the Court finds that CCA is entitled to summary judgment on all of the claims predicated on injury to Mr. Grassi, it is entitled to summary judgment on Ms. Grassi's loss of consortium claim as well.

### CONCLUSION

For the foregoing reasons, Ms. Grassi's Objections **(# 48)** to the March 6, 2008 Minute Order **(# 47)** of United States Magistrate Judge Kathleen M. Tafoya are **OVERRULED AS MOOT**. CCA's Motion for Summary Judgment **(# 53)** is **GRANTED** in its entirety and

judgment in favor of CCA on all claims in this case shall enter contemporaneously with this Order. CCA's Renewed Motion to Seal Exhibit P **(# 81)** to its summary judgment motion is **GRANTED**. In accordance with the Court's prior Order **(# 80)**, the Clerk of the Court shall unseal docket # 55. Docket # 68[16] shall remain under seal.

Dated this 9th day of December, 2008

**BY THE COURT:**

*/s/ Marcia S. Krieger*

Marcia S. Krieger
United States District Judge

---

[16]Docket # 68 is a single document that contains both Exhibit P, which the Court approves for sealing, and Exhibit Q, a letter offering Dr. Sutton employment with CCA. Because the Court has not considered Exhibit Q with regard to any of the issues raised herein, there is no public interest in access to that document, and the entirety of Docket # 68 can be sealed.